652 F.2d 1369
 Donald Angus McNULTY, Petitioner-Appellant,
v.
Antone OLIM, Warden, Hawaii State Prison; and Andrew I. T.
Chang, Director, Department of Social Services and
Housing, State of Hawaii, Respondents-Appellees.
 No. 80-4316.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 24, 1981.
Decided Aug. 14, 1981.
 
 Judith Ann Pavey, Honolulu, Hawaii, for petitioner-appellant.
 James H. Dannenberg, Deputy Atty. Gen., Honolulu, Hawaii, (argued), for respondents-appellees; George Yamamoto, Deputy Atty. Gen., Honolulu, Hawaii, on brief.
 Appeal from the United States District Court for the District of Hawaii.
 Before KILKENNY, SNEED, and FARRIS, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This is an appeal from the district court's denial of the appellant's petition for a writ of habeas corpus. Appellant was tried and convicted of murder in the State of Hawaii. Thereafter appellant, through new counsel, moved in a timely fashion for a new trial. His motion was denied. He appealed to the Supreme Court of Hawaii and argued, inter alia, that his trial counsel provided ineffective assistance. The Supreme Court affirmed both the conviction and the denial of the motion for a new trial.
 
 
 2
 Appellant then filed his petition for a writ of habeas corpus on the ground that he has been denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel. Although the Supreme Court of Hawaii did not explicitly cast its discussion on the effectiveness of the appellant's trial counsel in constitutional terms, we are convinced that the issue the appellant seeks to have reviewed by means of his petition for a writ of habeas corpus was presented to the Supreme Court of Hawaii fully, fairly, and precisely. Therefore, appellant has exhausted his state remedies without regard to whether further collateral relief might be available to him under Hawaii law. See United States ex rel. Bennett v. Rundle, 419 F.2d 599, 601 (3d Cir. 1970).
 
 
 3
 We affirm the district court's denial of appellant's petition.
 
 I.
 SUMMARY OF APPELLANT'S CONTENTIONS
 
 4
 Appellant primarily relies upon two alleged deficiencies in the performance of his trial counsel. The first is that counsel made and then erroneously withdrew an instruction that properly placed on the prosecution the burden of proving beyond a reasonable doubt that appellant did not kill his victim in self-defense. Self-defense was the appellant's sole defense asserted at the trial. The second is that trial counsel did not attempt to introduce testimony by the victim's former attorney concerning the victim's violent nature and his allegedly threatening letter to his attorney.
 
 
 5
 Appellant also argues that his trial counsel did not object to questions put to the appellant concerning his own violent tendencies. The district court in its review of the record also questioned the trial counsel's qualification of a prosecution witness as a firearms expert for the purpose of putting a question the answer to which apparently was unknown to counsel.
 
 II.
 POSITIONS TAKEN BY THE DISTRICT COURT
 
 6
 The district court, after setting forth a recital of the testimony at appellant's trial, which is set forth in the appendix to this opinion, took the position that trial counsel's major error was his withdrawal of his request for an instruction regarding the prosecution's burden of proof with respect to self-defense. This error, the district court concluded, was not one a reasonably competent attorney would have made.
 
 
 7
 Consistent with the requirement imposed by Cooper v. Fitzharris, 586 F.2d 1325 (9th Cir. 1978), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), the district court next considered whether this error prejudiced the appellant. This consideration, in effect, embodies an effort to certify a question to this court. This effort is revealed by two positions the district court took with respect to the issue of prejudice.
 
 
 8
 Initially the district court indicated that no prejudice resulted from the errors of trial counsel if the burden of the appellant was to show that "with a reasonably competent defense attorney (and reasonably competent does not mean perfect) it is more likely than not that the jury would have reached a different result, i. e., acquittal, or conviction on a lesser charge." It reached this conclusion after properly evaluating the collective, not seriatim, impact of the trial counsel's errors. See United States v. Altamirano, 633 F.2d 147, 153 (9th Cir. 1980). The district court did not stop at this point, however. It went further and stated that it would be required to find that prejudice existed if the proper standard was that the cumulative impact of the trial counsel's errors must have been harmless beyond a reasonable doubt. In effect, the district court requests that we choose one or the other standard.
 
 III.
 ANALYSIS
 
 9
 After thoroughly reviewing the record, we decline to choose between the alternatives presented to us by the district court. We are convinced that under either standard no prejudice within the meaning of Cooper v. Fitzharris, supra, exists. Moreover, we are by no means convinced that the district court's choices exhaust the possibilities. As we said in Cooper v. Fitzharris, supra at 1332, when the petitioner is not denied counsel but rather has counsel, omissions or commissions of counsel have an impact that "appears on the face of the record" and their effect "can be evaluated from that record with reasonable certainty." This strongly suggests that the proper test might well be whether the absence of prejudice is established with reasonable certainty. Should that be true we would have no difficulty in holding on the record before us that the absence of prejudice has been established with reasonable certainty.
 
 
 10
 AFFIRMED.
 
 APPENDIX
 
 11
 The district court's recital is as follows:
 
 
 12
 "The homicide apparently was the product of a love triangle. Petitioner lived with a woman, Francis Mary Hanson, at the time of the killing, and had at that time been living with her, in her apartment, for about two and one-half years. About a month before the killing Petitioner and Ms. Hanson met the decedent, Dion Yancey Cagle, for the first time. Petitioner and a friend were engaged in a 'friendly' sparring match and Cagle came by, struck up a conversation, and later went back to Ms. Hanson's apartment with her and Petitioner. During the next month Cagle visited the apartment several times, sometimes at the invitation of Petitioner and sometimes without an invitation. Petitioner testified at trial that he only invited Cagle once. When Cagle visited he usually played poker and drank with Petitioner and Ms. Hanson. Ms. Hanson testified that things were friendly until Petitioner and Cagle had 'a few too many' at which time they usually got into an argument. Petitioner would ask Cagle to leave, and when Cagle would refuse, Petitioner would order him to leave. Ms. Hanson testified that Cagle always left at that point in the argument, and there were never any physical fights between Petitioner and Cagle. (Transcript of Trial of Donald Angus McNulty in the Circuit Court of the First Circuit, State of Hawaii (hereinafter Tr.) at 142-43).
 
 
 13
 "Ms. Hanson testified that Cagle had shown a great deal of interest in her, and had on several occasions told Petitioner that he, Cagle, was going to take Ms. Hanson away. Several weeks before the killing, Cagle and Petitioner had apparently gotten into a loud argument over Ms. Hanson. Cagle had again stated that he was going to take Ms. Hanson away from Petitioner, and had emphasized his point by kissing Ms. Hanson in Petitioner's presence. (Tr. at 143). The argument was so loud that the police were called. Ms. Hanson testified Petitioner stated in anger that 'if he caught the two of us together, he would kill us both.' (Tr. at 144). There is apparently some question as to when exactly this threat was made, see Tr. at 174-76, but Ms. Hanson's testimony as to the fact of the threat was unequivocal. Petitioner testified that he could not recall having made any such threat. (Tr. at 244)
 
 
 14
 "A short time after this incident, Petitioner went to Detroit for a visit. While he was away, Cagle, Ms. Hanson, and a friend of theirs, Dexter Holst, had some drinks in Holst's apartment. Ms. Hanson testified that Cagle walked her home, and that they had sexual intercourse, 'but not on a voluntary basis.' (Tr. at 145). Ms. Hanson testified that Cagle attempted to strangle her when she screamed for the neighbors. (Tr. 180-81). She went out to dinner with Cagle the next evening, as dinner was Cagle's way of apologizing, and she also went out with Cagle the evening after that. (Tr. at 181). On the second evening, Ms. Hanson and Cagle also had sexual intercourse. On the third evening, after Cagle and Ms. Hanson had been dancing, Cagle was arrested for driving while intoxicated, and he was sentenced to jail.
 
 
 15
 "During Cagle's jail-term, Petitioner returned from the mainland. Ms. Hanson informed Petitioner that she and Cagle had been out to dinner several times, and Petitioner colloquially asked Ms. Hanson if she and Cagle had had sexual intercourse. Ms. Hanson told Petitioner that they had not. (Tr. at 147-48). Cagle was scheduled to get out of jail on February 19, 1975, and on that day Petitioner left for work at about 5:30 A.M. His normal working hours were from 7:00 A.M. until 3:30 P.M. He returned home, however, at about 6:15 A.M. and told Ms. Hanson that he had spoken to his boss and was taking the day off, Ms. Hanson testified that Petitioner told her that he 'had some business to take care of since Cagle was getting out that day.' (Tr. at 149). Petitioner claimed at trial, however, that he had had no idea when Cagle was getting out of jail. (Tr. 227 & 246) Petitioner took Ms. Hanson to the hospital that morning for a pre-scheduled appointment. While she was there Petitioner drove to a pawn shop and redeemed his .44 caliber Magnum rifle, which he had pawned about eight months before. (Tr. at 227-28). Petitioner then picked up Ms. Hanson and they drove home, arriving at about 9:30 A.M. Petitioner testified that upon returning home he loaded the rifle, because he 'always kept it loaded' (Tr. at 228), and then placed it in a closet. Petitioner testified that he then had a few drinks.
 
 
 16
 "Ms. Hanson testified that after she returned home she walked over to Holst's apartment, where Cagle was visiting, and stated: 'McNulty got his rifle out, this morning, that's all I have to say.' (Tr. at 151). At about 11:15 A.M. Cagle went over to Ms. Hanson's apartment, and Petitioner, according to Ms. Hanson, invited Cagle in. Petitioner asked Cagle if he and Ms. Hanson had had sexual intercourse, and Cagle replied that they had not. (Tr. at 153) Cagle and Petitioner then started playing poker with Ms. Hanson dealing. At about 1:00 P.M. Petitioner lost all his money and the game terminated. Ms. Hanson pointed out to the two that some money was missing, and she testified that while she was counting the chips Cagle and Petitioner were engaged in their 'general, low-toned hassle.' (Tr. at 159). Ms. Hanson described this as Petitioner and Cagle's normal conversation, and said that it was not really an argument. Ms. Hanson did not hear any raising of voices or see any fast movements. While she was counting the chips, she saw Cagle moving around and sensed him walk past her. As she was stacking the chips, she heard a shot and turned around. She saw McNulty with a rifle under his elbow, and Cagle lying on the ground, with one foot over a chair, and his hands clasped across his chest, under his body. (Tr. at 162-63). Ms. Hanson then went out and called the police.
 
 
 17
 "Ms. Hanson, on cross-examination, testified that she had heard Petitioner ask Cagle to leave, as he usually did, and that she had noticed this, as opposed to the rest of the conversation, because the volume had gone up a bit. She also testified on cross-examination that on the morning of the homicide she had taken some asthma medicine, and had also had a few drinks. Her doctor had told her not to drink while taking the medicine. Ms. Hanson testified on redirect that when Cagle fell, his head landed about two feet away from Petitioner's feet.
 
 
 18
 "Petitioner testified that during the poker game Cagle had started hitting him on the shoulder. He testified that Cagle stated: 'Why don't you fight so I can get you down and stomp you?' (Tr. at 235). Petitioner testified he then ordered Cagle to leave and Cagle refused, simply showing Petitioner his fist. Petitioner testified that at that point he got the rifle out of the closet and ordered Cagle to leave again. Cagle allegedly then stated: 'You little punk, I can break you in half,' and charged Petitioner. Petitioner testified that when Cagle was about two feet from the end of the barrel he fired. (Tr. at 236-37).
 
 
 19
 "Petitioner also testified that when he had been in the military he had had hand-to-hand combat training, and had been Ranger-qualified, Airborne-qualified, and Special Forces-qualified. (Tr. at 239-40).
 
 
 20
 "The first police officer to arrive at the scene testified that when he arrived he asked Petitioner what had happened, and Petitioner replied, 'Nothing.' The officer then asked Petitioner where the rifle was, and Petitioner told him it was on the bed. After looking at the rifle, the officer examined the body and turned it over to see if Cagle was still breathing. He was not. The officer testified that Petitioner stated: 'I am glad I killed him, he deserved to die.' (Tr. at 207). Petitioner denied having made this statement. (Tr. at 238, 245 & 260) The officer also testified that Petitioner made this statement in an 'angry and satisfied tone,' whatever that means. (Tr. at 207).
 
 
 21
 "Officer Hicks, the second officer at the scene, testified that when he examined Cagle's body he found currency clenched in one hand. (Tr. at 194). Officer Hicks also testified that Cagle was wearing swimming trunks and a tank-top. Officer Hicks stated that 'the apartment appeared clean, nothing was messed up, everything was in place, there was nothing turned over or anything to suggest any type of a struggle.' (Tr. at 196). He also testified that Petitioner had appeared neatly dressed with his hair combed. (Tr. at 196).
 
 
 22
 "One photograph of the Hanson apartment that was introduced into evidence showed a partially-smoked cigarette butt near decedent's right hand. (Tr. at 43). That cigarette butt, which had blood on it, was also introduced into evidence. (Tr. at 63). The rifle bullets had hollow points, which means that they mushroom on impact. Five rounds were found in the rifle magazine, and there was a spent shell in the chamber. (Tr. at 66).
 
 
 23
 "Dexter Holst, a friend of Petitioner who lived in an apartment in Petitioner's building, testified that after he heard the shot, he was visited by Ms. Hanson who asked to use his phone. Mr. Holst went over to the Hanson apartment and saw petitioner. He testified that Petitioner stated: 'He come at me in my house, I had to do my thing.' (Tr. at 113). Holst also testified that Petitioner stated in conjunction with the statement just quoted: 'He was busting up my house.' (Tr. at 113-18). The testimony of Holst is somewhat contentious on this point, but he essentially admitted that Petitioner had made this statement, and also that he, Holst, had so reported to a police officer.
 
 
 24
 "Mr. Holst testified that the relationship between Petitioner and Cagle had been friendly. (Tr. at 125). He also testified, however, that Cagle had often needled Petitioner, and had told Petitioner that he, Cagle, could 'take' him. Cagle had also, according to Holst, stated that he had killed twice before. (Tr. at 125)."
 
 
 25
 Our review of the record reveals the following additions to the testimony above summarized by the district court: McNulty admitted that he did not see any weapon in Cagle's possession. Tr. at 262. Holst testified that, on the day of his death, Cagle was smoking Salem cigarettes and had a pack of Salems with him that morning. Tr. 104. The partially smoked bloodstained cigarette found near Cagle's hand was a Salem cigarette. Tr. at 61-63. Holst testified that, after the shooting but prior to the arrival of the police, McNulty said to him, "Hey, Buddy, we'd better split." Tr. at 121. McNulty denied that statement. Tr. at 252.